# Stephen Block

51 Stanley Circle, Staten Island, New York 10308
Phone (718) 984-5403      Cell (917) 846-1933
E-mail SMB512@aol.com
www.gamblingexpertwitness.com

**Professional Experience**

January 1996 – Present
**Private Practice Consultant**
- Certified as an Expert Witness on Pathological Gambling –by U.S. Senior District Court Judge Jack B. Weinstein, U.S. District Court, EDNY
- Assess, evaluate and provide treatment to probation and parole clients
- Prepare forensic reports and provide testimony in State and Federal Courts in gambling related cases

October 2003 – February 2012
S.A.F.E., Brooklyn, New York
**Addiction Specialist**
- Developed problem gambling program in an existing state licensed substance abuse outpatient program

- Counsel problem and compulsive gamblers and substance abusers, individually and in groups, in a community-based outpatient treatment center.

- Participate in community outreach efforts to raise awareness about addiction

December 1995 – present
Gamblers' Treatment Center, Staten Island, New York
**Counselor/Outreach and Education Specialist**

- Counsel problem and compulsive gamblers and significant others, individually and in groups, in a state-funded outpatient treatment program
- Provide education and prevention presentations to interested groups including schools, professional organizations, community groups, treatment programs, unions, employee assistance programs
- Consulted on original RFP and program development in 1981
- Conducted group at senior residence on compulsive behavior (alcohol, drugs, gambling)
- Individual relapse prevention work with recovering MICA clients
- Member, Medical Center Outreach Committee
- Lecturer, Family Addiction Series, Bayley Seton Hospital

**Professional Activities**

Certified as an Expert Witness on Pathological Gambling –
by U.S. Senior District Court Judge Jack B. Weinstein,
U.S. District Court, Eastern District of New York


EXHIBIT E

- Founding Member, Association of Problem Gambling Professionals, New York State

- Chairman, Gambling Curriculum Development Think Tank, NY State

- Presenter at New York, New Jersey and national conferences

- Member, State Assembly Task Force on Mental Health, appointed by Assemblyman Peter Rivera, Chair of Mental Health Committee

- Certified as trainer and supervisor of New York Gambling Treatment Counselor Certification Training

- International Problem Gambling Consultant – The Bahamas

**Professional Memberships**

- New York Council on Problem Gambling – Founder and President

- National Council on Problem Gambling

- Compulsive Gambling Council of New Jersey

- Association of Problem Gambling Professionals, N.J. – Vice President

**Certification**

- CPGC – Credentialed Problem Gambling Counselor – N.Y. State OASAS – Credential #2

- ICGC-II – Internationally Certified Gambling Counselor - #162

**Education**

- B.A. in Sociology, Brooklyn College, 1968

- CAC courses (250 hours) St. John's University

**Awards**

- Council On Compulsive Gambling Of N.J. – Hourglass Award – 2004

- New York Council On Problem Gambling – Lifetime Treatment Counselor Achievement Award – 2009

- SAFE Foundation – Clinician of the Year Award – 2010

- OASAS – Problem Gambling Counselor of the Year – 2013

- National Council on Problem Gambling – Jeff Beck Recovery Ambassador Award - 2022

# Stephen Block

## Assessment and Evaluation

The purpose of this report is to assess and evaluate the gambling history and behavior of Ms. Karen Carter Peterson (dob: 11/01/1969).

Widely accepted gambling assessment tools and a narrative interview were utilized to determine Ms. Peterson's pattern of gambling and whether a diagnosis of *Disordered Gambling (DSM-5 312.31)* could be applied to her.

## Interview

The interviews with Ms. Peterson was conducted on March 11, 2022, at 2842 South Ocean Boulevard, Palm Beach, FL 33480 and on July 21, 2022 at 425 Summer Street, Boston, MA 02210.

## Qualifications of Evaluator

I have worked with problem gamblers for over 40 years, accumulating in excess of 35,000 clinical hours. For many years I worked at the Gamblers Treatment Center, an outpatient program administered by St. Vincent's Medical Center and more recently by Richmond University Medical Center in New York City. I also worked for the SAFE Foundation, a privately operated, state licensed addiction treatment program in Brooklyn, NY, where I developed the gambling treatment track. I am a founding member and current President of the New York Council on Problem Gambling, an organization dedicated to raising public awareness about problem gambling across New York State. I have conducted seminars and presentations throughout the United States on this issue and have trained other treatment professionals seeking certification. In addition to working with voluntary clients, I continue to work with the Legal Aid Society, Federal Defenders Office, New York State Department of Probation, Division of Parole, and the United States Pretrial Services and United States Probation and Parole Division in the Eastern and Southern Districts of New York evaluating their clients. The Honorable Jack B. Weinstein, Senior District Judge, Eastern District of New York, under Rules 702, 703 Federal Rules of Evidence, acknowledged me as an expert witness (U.S. v Liu) in November, 2003. I have testified and submitted over 300 evaluations in the Federal Districts of New York, New Jersey and Maryland as well as state courts in New York and New Jersey. I am currently a consultant to the Problem Gambling Awareness Committee in The Bahamas. I hold the following current credentials and certifications:

Credentialed Problem Gambling Counselor (New York State OASAS Credential #2)
International Compulsive Gambling Counselor-Level II - (#314)

# Stephen Block

## Gambling and Relevant Family History

Karen Carter Peterson (dob: 11/01/1969), currently residing at 2336 Valence Street, New Orleans, LA 70115 is the middle child of three siblings. She has two sisters, Tara Elizabeth (dob: ▓▓▓▓), and Eileen Teresa (dob: ▓▓▓▓). Her parents, Kenneth and Gwendolyn Carter, were married for 53 years until his passing in 2018. Ms. Peterson relates that her grandparents and other members of her extended family were instrumental in her upbringing since her parents both had to work hard and long hours to provide for the family. Certain core values were instilled in her during her formative years. Her job was to work hard, be a good person, be honest, treat others like you wanted to be treated, love God, pray and be of service, and not to squander opportunity. The family motto was "never give up."

Her parents made many sacrifices to keep Karen and her sister Tara in Catholic school. They both worked several jobs, and even when her father was completing college and law school, he worked part-time. Church was an important part of family life as was community service. Karen remembers volunteering at church, engaging at the CYO and the YMCA, and working with underprivileged kids every summer. Despite her parents' insistence on hard work and getting good grades, Karen rebelled and she relates that punishment often was the norm rather than the exception. She relates that her parents didn't mind pulling out the belt, so a whipping was part of the punishment. Karen became numb to punishment and she was not motivated to change.

While working with her father in the political organization, BOLD (Black Organization for Leadership Development) that he co-founded, Karen discovered her interest in politics and campaigning. Her initial foray into politics was knocking on doors to get out the vote, doing mailings and working the phone banks. Her Dad was a major influence in her life and her subsequent choice of becoming an attorney and pursing a political career.

Ms. Peterson's earliest recollection of gambling was of her maternal grandmother's gambling and interest in horseracing. Her father and his business associates also were regular attendees at the Fairgrounds, the local horseracing track. Although she relates that her Dad could gamble within his means and that it was never a problem for him, the same could not be said about his associates. Karen remembers the card games at her family's home. Pitty Pat, Gin Rummy and Spades were the games of choice. At the age of 16, on a political junket to The Bahamas, she experienced the thrill of the casino for the first time. As is often the case with first time gamblers, she won and in addition her father's friend gave her some of his winnings, and she happily went shopping.

Her gambling continued throughout college and through her first marriage. Her husband found out about her gambling and this was a contributing factor in their divorce.

She relates that her husband went to his mother to borrow money to pay bills because of her gambling, and that he was furious about her lying about the gambling and "it was all downhill from there." On a number of occasions Karen's parents bailed her out of her gambling debt. She recognizes today that it was enabling behavior on their part trying to "protect their little girl from pain." Of course, this did not stop her from continuing her gambling behavior.

Ms. Peterson relates that her gambling at casinos in Mississippi and Louisiana was mostly at slot machines, and occasionally blackjack and craps (dice games.) She recalls using gambling to mitigate ████████████████████████████████████████. She attended Gamblers Anonymous beginning in 1997 and has been in and out of that program for over 20 years. She started seeing a private therapist in 1997 and continued under his care for approximately 10 years. There were also sessions with other therapists throughout the past 20 years.

The death of her father Kenneth in 2018 was a tremendous loss for which gambling acted as an escape and self-medication. These negative life events often exacerbate gambling behavior. It certainly was the case for Ms. Peterson.

On November 1, 2021 (her birthday), she entered CORE, The Center of Recovery, in Shreveport, LA. It is a residential facility that provides gambling treatment and recovery. It has been operating since 1999 and is recognized as one of the most effective gambling treatment programs in the United States. Karen completed treatment there after 33 days. She has been abstinent from gambling since September 28, 2021. Karen has continued her recovery by regularly attending Gamblers Anonymous meetings 5 days a week. In addition, since her successful discharge for CORE, she has been a member of the CORE Alumni Group, and on Fridays is the host of the meeting. She also has individual therapy sessions with Matricia Green twice weekly and one group therapy session weekly. Karen regularly attends church, engages in daily prayer and meditation, and follows an exercise regimen.

## Gambling is an Addiction

In 2013 The American Psychiatric Association (APA) formally recognized disordered gambling as an addiction, grouping it together with substance use under the classification "Substance-Related and Addictive Disorders" in the Diagnostic and Statistical Manual of Mental Disorders (*DSM-5 312.1*). This new classification followed more than two decades of study and deliberation, representing a modification from gambling's prior classification as an impulse-control disorder. As an addiction,

## Stephen Block

disordered gambling is now understood to be a physiological as well as psychological condition with observable manifestations in the human brain chemistry. As the article linked in footnote 1 explains, the biology and behavior of disordered gambling and drug addiction are virtually identical, with clear patterns in the production of dopamine, serotonin and other neurotransmitters.

> The APA based its decision on numerous recent studies in psychology, neuroscience, and genetics demonstrating that gambling and drug addiction are far more similar than previously realized. Research in the past two decades has dramatically improved neuroscientists' working model of how the brain changes as an addiction develops. In the middle of our cranium, a series of circuits known as the reward system links various scattered brain regions involved in memory, movement, pleasure and motivation. When we engage in an activity that keeps us alive or helps us pass on our genes, neurons in the reward system squirt out a chemical messenger called dopamine, giving us a little wave of satisfaction and encouraging us to make a habit of enjoying hearty meals and romps in the sack. When stimulated by amphetamine, cocaine or other addictive drugs, the reward system disperses up to 10 times more dopamine than usual.
>
> Research to date has shown that pathological gamblers and drug addicts share many of the same genetic predispositions for impulsivity and reward seeking. Just as substance addicts require increasingly strong hits to get high, compulsive gamblers pursue ever riskier ventures. Likewise, both drug addicts and problem gamblers endure symptoms of withdrawal when separated from the chemical or thrill they desire. And a few studies suggest that some people are especially vulnerable to both drug addiction and compulsive gambling because their reward circuitry is inherently underactive – which may partially explain why they seek big thrills in the first place.[1]

A number of studies, including a study from the Yale University School of Medicine entitled *Brain Activity in Pathological Gambling*, exemplify the compelling science of gambling addiction, demonstrating brain changes through magnetic imaging that correspond to the cycles of reward, gratification, and other human responses.[2] A collection of such research has been compiled by the National Center for Responsible Gambling and is linked in footnote 2, below.

*Page 4 of 8 pages*

---

[1] http://www.scientificamerican.com/article/how-the-brain-gets-addicted-to-gambling/
[2] http://www.ncrg.org/sites/default/files/uploads/docs/monographs/ncrgmonograph6final.pdf

# Stephen Block

Ms. Peterson was assessed by me for Disordered Gambling utilizing the widely accepted assessment tool.

The DSM-5 Disordered Gambling Assessment was administered to Ms. Peterson with the following result. Ms. Peterson scored 9/9 where a score of 4+ would indicate a diagnosis of Disordered Gambling (DSM-5 312.31). The screening questions address the nine diagnostic criteria indicated in the DSM-5 to confirm diagnosis of Disordered Gambling.
The clinical indicators are:

1. Preoccupation: Is often preoccupied with gambling (e.g., having persistent thoughts of reliving past gambling experiences, handicapping or planning the next venture, thinking of ways to get money with which to gamble).
2. Tolerance: needs to gamble with increasing amounts of money in order to achieve the desired excitement.
3. Repeated unsuccessful attempts to cut back or stop gambling.
4. Restlessness and irritability when attempting to cut back or stop.
5. After losing money, often returns to get even (chasing behavior).
6. Lies to conceal extent of gambling.
7. Gambles when feeling distressed (e.g., helpless, guilty, anxious, depressed).
8. Relies on others to provide money to relieve a desperate financial situation caused by gambling.
9. Jeopardized or lost significant relationships, job or educational opportunities because of gambling.

# Stephen Block

## Narrative support of Assessment

1. Preoccupation: Ms. Peterson spent many hours thinking about gambling, participating in gambling and trying to come up with money to continue her gambling activities.
2. More and more money, time and energy were required to sustain her gambling behavior.
3. Ms. Peterson answered yes to this question. The self-medicating quality of her gambling was a factor in this answer. She was fearful of stopping because gambling was an escape from the trauma she experienced throughout her life. Many women gamblers have a significant trauma history. Ms. Peterson made a number of unsuccessful attempts to cut down or stop gambling over the course of 20+ years.
4. Ms. Peterson's emotional state reflected her irritability when attempting to cut back on her gambling.
5. Chasing behavior is a unique feature of gambling addiction. Gamblers continue to gamble to "get even" and to provide money for future wagers. This activity provided an element of escape and excitement for Ms. Peterson. As her gambling progressed and she started to lose heavily, she felt a need to get even and gamble even more. It was no longer strictly enjoyable or exciting; there was a compulsion to win back her losses and continue to self-medicate.
6. Ms. Peterson made every effort to conceal the extent of her gambling from family, friends, and business associates. She would minimize the amount of betting. She would borrow money and not be forthcoming about what it was intended for. At the end, of course, these efforts proved futile. Her friends and family weren't fooled. They eventually knew it was for gambling.
7. Ms. Peterson gambled in part to escape the problems created by previous gambling episodes. This paradoxical behavior is common with disordered gamblers. They believe, irrationally, that gambling more can solve the problems of gambling. [redacted]
8. Ms. Peterson used her own assets to gamble, and when she was unable to utilize her assets, she borrowed from friends and family to sustain her gambling activities.
9. Ms. Peterson has jeopardized her career, her reputation, and lost her assets because of her gambling behavior.

# Stephen Block

## Assessment Conclusions:

The results of this assessment indicate that Ms. Peterson satisfies the DSM-5 diagnosis of Disordered Gambling (DSM-5 312.31) with a specification of persistent and severe. Persistent specifier is indicated if gambler has experienced continuous symptoms to meet diagnostic criteria for multiple years. She continued to gamble despite the consequences and the fear of disclosure of her activities. She has experienced impaired judgment and diminished insight as a result of her gambling behavior. Disordered gambling is classified as a behavioral addiction and Ms. Peterson's gambling history is consistent with and indicates an inability to control her impulse to gamble. This lack of control **contributed significantly** to her behavior and the negative consequences of her behavior.

Specifically, as with addictive behaviors generally, Ms. Peterson engaged in a cycle of rationalizations that enabled her to feed her addiction while blocking out the negative consequences. The anxiety of risk is present, but managed and insufficient to overcome the compulsion. Ongoing gambling treatment would identify such rationalizations for what they were and, in going forward for what they are – justifications to continue gambling. Treatment permits one with disordered gambling to identify risks and make positive choices.

Current research indicates that addiction (including behavioral addiction, i.e., disordered gambling) is a brain disease. The American Society of Addiction Medicine (ASAM) defines addiction as:
A primary, chronic disease of brain reward, motivation, memory and related circuitry. Dysfunction in these circuits leads to characteristic biological, psychological, social and spiritual manifestations. This is reflected in an individual pathologically pursuing reward and/or relief by substance use and other behaviors.

Addiction is characterized by inability to consistently abstain, impairment in behavioral control, craving, diminished recognition of significant problems with one's behaviors and interpersonal relationships, and a dysfunctional emotional response. Like other chronic diseases, addiction often involves cycles of relapse and remission. Without treatment or engagement in recovery activities, addiction is progressive and can result in disability or premature death.

# Stephen Block

### Recommendations

Ms. Peterson would benefit from continued and uninterrupted professional treatment and self-help meetings. Research has shown that the efficacy of positive treatment outcomes is greatly increased when such treatment is consistent, long term and completed. She has managed not to gamble for six months and is attending Gamblers Anonymous meetings while continuing with professional counseling. Ms. Peterson indicated that she is motivated to engage in treatment and that she wants to make positive changes in her life. Ongoing treatment greatly reduces the risk of relapse. It is important for disordered gamblers to gain and maintain insight into the connections between their gambling behavior and the consequences of such behavior. This is best accomplished in a treatment regimen combining psychotherapy, Gamblers Anonymous meetings, and daily constructive engagement. Ms. Peterson would also benefit from psychological treatment to address the trauma issues in her history. Ms. Peterson has also benefitted from the support of her family. In my experience, recovery efforts are greatly enhanced by the supportive atmosphere provided by the family setting. Any change in the family dynamics would further compromise her recovery efforts.

In my professional opinion, based upon 35 years of experience in working with problem gamblers, Ms. Peterson would best serve the public good by participating in either a diversion program for disordered gamblers, or in a delayed prosecution. Based upon her history and the present state of her recovery, the strong message she could provide as a recovering disordered gambler would act as a deterrent for anyone to engage in any inappropriate behavior associated with their gambling. The fact that she is willing to make financial restitution, engage in treatment, and publicly acknowledge her misconduct and life story is a strong indicator for a compassionate plan for diversion.